IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF FLORIDA
TAMPA DIVISION

| | |
|---|---|
| UNITED STATES EQUAL ) | |
| EMPLOYMENT OPPORTUNITY ) | |
| COMMISSION, ) | |
| ) | |
| Plaintiff, ) | |
| v. ) | CIVIL ACTION NO. _____ |
| ) | |
| NESTLE WATERS. ) | COMPLAINT |
| NORTH AMERICA, INC., ) | |
| ) | |
| Defendant. ) | **JURY TRIAL DEMAND** |
| _____) | |

NATURE OF THE ACTION

This is an action under Title VII of the Civil Rights Act of 1964 and Title I of the Civil Rights Act of 1991 to correct unlawful sex-based practices, and to provide appropriate relief to Dawn Bowers-Ferrara, who was adversely affected by such practices. As alleged with greater specificity below, Defendant, Nestle Waters North America, Inc., selected a less qualified male candidate for a promotion and then terminated Dawn Bowers-Ferrara's employment because of her sex, female.

## JURISDICTION AND VENUE

1. Jurisdiction of this Court is invoked pursuant to 28 U.S.C. §§ 451, 1331, 1337, 1343 and 1345. This action is authorized and instituted pursuant to Section 706(f)(1) and (3) of Title VII of the Civil Rights Act of 1964 ("Title VII"), as amended, 42 U.S.C. §2000e-5(f)(1) and (3), and Section 102 of Civil Rights Act of 1991, 42 U.S.C. §1981a.

2. The challenged discrimination took place in, and Dawn Bowers-Ferrara ("Ferrara")—had she been promoted—would have worked in, the jurisdiction of the United States District Court for the Middle District of Florida, Tampa Division.

## PARTIES

3. Plaintiff, the Equal Employment Opportunity Commission ("EEOC"), is the agency of the United States of America charged with the administration, interpretation and enforcement of Title VII, and is expressly authorized to bring this action by Section 706(f)(1) and (3) of Title VII, 42 U.S.C. §2000e-5(f)(1) and (3).

4. At all relevant times, Defendant, Nestle Waters North America, Inc. ("NWNA") has continuously been doing business in the State of Florida, and has continuously had at least 15 employees.

5. NWNA is a division of Nestle Waters, a bottled water company.

6. At all relevant times, NWNA has continuously been an employer engaged in an industry affecting commerce within the meaning of Sections 701(b), (g) and (h) of Title VII, 42 U.S.C. §§ 2000e(b), (g) and (h).

## CONDITIONS PRECEDENT

7. More than thirty days prior to the institution of this lawsuit, Bowers-Ferrara filed a charge with the EEOC alleging violations of Title VII by NWNA.

8. The EEOC issued a Letter of Determination on May 5, 2015, finding reasonable cause to believe that NWNA violated Title VII by discriminatorily denying Bowers-Ferrara a promotion and terminating her employment on the basis of her sex (female).

9. The EEOC engaged in communications with Defendant to provide Defendant the opportunity to remedy the discriminatory practices described in the Letter of Determination.

10. The EEOC was unable to secure from defendant(s) a conciliation agreement acceptable to the Commission.

11. On July 9, 2015, EEOC issued Defendant a Notice of Failure of Conciliation.

12. All conditions precedent to the institution of this lawsuit have been fulfilled.

## STATEMENT OF FACTS

### *Bowers-Ferrara*

13. In December 1992, NWNA hired Bowers-Ferrara as an accountant in its Connecticut corporate office.

14. At the time of her hire, Bowers-Ferrara had a Bachelor of Science in Accounting from Fordham University and was a Certified Public Accountant.

15. In 1996, Bowers-Ferrara was promoted to Division Finance Manager, a position responsible for the management of finances for the entire state of Florida.

16. In 2004, NWNA changed the structure of its Florida operations and created a North Florida Zone and South Florida Zone.

17. Each of the two Zones was led by a Zone Management team consisting of a Zone Manager, who supervised: a Zone Logistics Manager, a Zone Operation Manager, a Zone Training and Sales Manager, a Zone Warehouse Manager, a Zone Sales Manager, and Zone Business Manager (collectively, "Subordinate Zone Managers").

18. Bowers-Ferrara was named the Zone Business Manager ("ZBM") for the North Florida Zone in 2004.

19. As North Florida ZBM, Bowers-Ferrara was responsible for finance, budgeting, and supervision of the Zone administrative team.

20. The job description for the North Florida ZBM position required the following threshold qualifications: (1) 3-5 years of business experience in a finance-specific role; (2) a Bachelor's degree; and (3) 1-3 years of experience in leading people.

21. Bowers-Ferrara met or exceeded each of these requirements when she became North Florida ZBM.

22. From 2004 until her 2012 termination, Bowers-Ferrara received positive performance reviews and was regularly praised by supervisors and other management officials.

23. She consistently received a rating of "achieved" or "exceeded objectives" in all categories in which she was evaluated.

24. From 2008 to 2010, Bowers-Ferrara successfully performed her North Florida ZBM with no direct supervisor.

25. In 2010, Sean Hassett ("Hassett") became Zone Manager for the North Florida Zone, and therefore Bowers-Ferrara's direct supervisor.

26. Once Hassett became Zone Manager, Bowers-Ferrara continued to receive positive

performance reviews and regular praise for her work.

### *Mark Gleason*

27. From January 2011 to April 2012, Mark Gleason served as the South Florida ZBM.

28. He had served in other Subordinate Zone Manager positions during his tenure with NWNA.

29. The ZBM position was his first finance position at NWNA.

30. The job description for the South Florida ZBM position was identical to the job description for Bowers-Ferrara's North Florida ZBM position.

31. Gleason did not meet the threshold requirements for the ZBM position in the South Florida Zone when he was hired for that position.

32. Gleason's performance evaluations were less successful than those provided to Bowers-Ferrara.

### *All-Boys Club and Implicit Condoning of Discrimination*

33. As North Florida Zone Manager, Hassett supervised Bowers-Ferrara and five other Subordinate Zone Managers, all of whom were male.

34. Hassett and the male Subordinate Zone Managers frequently socialized and went out to lunch, dinner, baseball games, drinks, or other events during and after work, and did not tell Bowers-Ferrara or invite her to join them.

35. These events were paid for with NWNA's credit card, which, according to NWNA policy, was to be used only for team-building or other business-related matters.

36. The consistent exclusion of Bowers-Ferrara from these gatherings cost her valuable bonding time with her supervisor and colleagues, and may have deprived her of information

relevant to the team's day-to-day operations.

37. In early 2012, Bowers-Ferrara attended two national NWNA management conferences, both of which included smaller meetings with female managers.

38. The meetings with female managers were held in response to an internal NWNA analysis that determined that NWNA had "some opportunity to improve the balance of women" in its workforce.

39. At the smaller female-manager meeting during the first conference, Bowers-Ferrara told those present—including a male vice-president who was among those running the meeting—that she was excluded from work-related lunches and outings that her male supervisor and male cohorts frequently took on company time and with company funds.

40. The male vice-president's demeanor toward Bowers-Ferrara changed quickly after she said this; he went from relaxed and open to very uncomfortable.

41. Neither the male vice-president nor anyone else asked Bowers-Ferrara follow-up questions or spoke to her about her concerns.

42. No one at the meeting gave the participants any information as to what, if any, follow-up there would be with respect to the issues of sex discrimination raised.

43. At a meeting for NWNA female financial managers held at the second conference shortly thereafter, Bowers-Ferrara raised the same concerns.

44. Once again, no one at the meeting gave the participants any information as to what, if any, follow-up there would be with respect to the issues of discrimination raised.

*Non-Promotion*

45. In February 2012, NWNA officials decided to consolidate the North and South

Florida Zones into a single Florida Zone.

46. In the new consolidated structure, there was to be only one Zone Business Manager for the state of Florida.

47. Approximately two weeks after Bowers-Ferrara returned to the office from the second of the above-described conferences, Hassett called her into his office and told her that he had selected Gleason over her to be the Florida ZBM.

48. During this meeting, Hassett provided no paperwork and had no one from human relations in his office—both of which contravened established NWNA practice.

49. Bowers-Ferrara asked to remain at NWNA in another position.

*Termination*

50. On or about September 26, 2012, Hassett called Bowers-Ferrara into his office and told her that this would be her last day of work.

51. Again, there was no one from human relations in Hassett's office.

52. Hassett provided Bowers-Ferrara with a document detailing her severance.

53. Despite her 20 years of NWNA service, Bowers-Ferrara was offered only six months of severance pay.

54. Previously, a male Subordinate Zone manager, who had been terminated after less than a year at NWNA for performance problems (and was therefore, unlike Bowers-Ferrara, ineligible for rehire), received two months of severance.

55. Prior to the consolidation of the North and South Florida Zones, there were 12 Subordinate Zone Managers and two Zone Managers.

56. Bowers-Ferrara was the only female among these 14 managers and the only person

whose employment was terminated.

57. As a result, Bowers-Ferrara was harmed and sustained damages.

## STATEMENT OF CLAIMS

58. Paragraphs 13 through 57 are fully incorporated herein.

59. NWNA engaged in unlawful employment practices, in violation of Section 703(a)(1) of Title VII, 42 U.S.C. § 2000e-2(a)(1), by discriminatorily failing to promote Bowers-Ferrara to the Florida Zone Business Manager position, and then discriminatorily terminating her employment.

60. The effect of the practices complained of in paragraphs 13 through 57 has been to deprive Bowers-Ferrara of equal employment opportunities and otherwise adversely affect her status as an employee because of sex.

61. The unlawful employment practices complained of in paragraphs 13 through 57 above were intentional.

62. The unlawful employment practices complained of in paragraphs 13 through 57 above were done with malice or with reckless indifference to the federally protected rights of Bowers Ferrara.

## PRAYER FOR RELIEF

Wherefore, the EEOC respectfully requests that the Court, *inter alia*:

A.   Grant a permanent injunction enjoining Defendant NWNA, its officers, agents, servants, employees, attorneys, and all persons in active concert or participation with it, from participating in discriminatory conduct based on sex, including but not limited to failing to promote and terminating employees because of their sex.

B. Order Defendant NWNA to institute and carry out policies, practices, and programs which provide equal employment opportunities for women.

C. Order Defendant NWNA to make whole Bowers-Ferrara, by providing appropriate backpay with prejudgment interest, in amounts to be determined, and other affirmative relief necessary to eradicate the effects of its unlawful employment practices.

D. Order Defendant NWNA to make Bowers-Ferrara whole, by providing compensation for past and future pecuniary losses resulting from the unlawful employment practices described in paragraphs 13-57 above.

E. Order Defendant NWNA to make Bowers-Ferrara whole by providing compensation for past and future nonpecuniary losses resulting from the unlawful practices complained of in paragraphs 13-57 above, including emotional pain, suffering, inconvenience, loss of enjoyment of life, and humiliation, in amounts to be determined.

F. Order Defendant NWNA to pay Bowers-Ferrara punitive damages for its malicious and reckless conduct described in paragraphs 13-57 above, in amounts to be determined.

G. Grant such further relief as the Court deems necessary and proper in the public interest.

H. Award the EEOC its costs.

### JURY TRIAL DEMAND

The EEOC requests a jury trial on all questions of fact raised by its complaint.

Date: September 21, 2015

                   RESPECTFULLY SUBMITTED,

P. DAVID LOPEZ
General Counsel
JAMES L. LEE
Deputy General Counsel
GWENDOLYN YOUNG REAMS
Associate General Counsel
U.S. Equal Employment Opportunity
Commission
131 M Street, N.E.
Washington, D.C. 20507

ROBERT E. WEISBERG
Regional Attorney

KIMBERLY A. McCOY-CRUZ
Supervisory Trial Attorney

JAN SHELLY
Senior Trial Attorney
Missouri Bar # 42085
Tel: 813-202-7947
Fax: 813-228-2841
jan.shelly@eeoc.gov
U.S. Equal Employment Opportunity
Commission
Tampa Field Office
501 E. Polk St.
Tampa, Florida 33602

DANIEL SELTZER
Trial Attorney
New York Bar. No. 5081179
Massachusetts Bar No. 680997
Tel: 305-808-1786
Fax: 305-808-1835
daniel.seltzer@eeoc.gov
U.S. Equal Employment Opportunity
Commission
Miami District Office
100 S.E. 2nd Street, Suite 1500
Miami, Florida 33131